IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| ADRIENNE GROSS TOWNES, | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-15-1093 |
| MD. DEP'T OF JUVENILE SERVS., | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

*I. Background*

In this removed case, Plaintiff Adrienne Gross Townes complains that Defendant, the Maryland Department of Juvenile Services (the "Department"), violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and under the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-606, in connection with her leaves of absence while she was employed with the Department. (Compl., ECF No. 2.) Earlier, the Court granted the Department's motion to dismiss with respect to Count I, which alleged the Department violated the FMLA by not providing Townes adequate notice of her rights under that statute. (ECF Nos. 19 & 20.) Remaining in the case are Count II (retaliation in violation of the FMLA) and Count III (failure to accommodate in violation of MFEPA).

Now pending before the Court is the Department's motion for summary judgment (ECF No. 37), which has been briefed by the parties (ECF Nos. 45 & 46). No hearing is required. Local Rule 105.6 (D. Md. 2016). The motion will be granted as to Count II and denied as to Count III.

## II. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## III. Analysis

### A. Count II – Retaliation under the FMLA

In her opposition to the Department's motion for summary judgment, Townes contends the Department retaliated against her, in violation of the FMLA, by issuing her a letter of reprimand as well as an unsatisfactory performance evaluation shortly after returning to work

from her second leave of absence, thereby preventing her from utilizing sick leave from the State Employees' Leave Bank. (Pl.'s Opp'n 24-25.) The evidence does not support her argument.

A claim of retaliation under the FMLA is brought pursuant to 29 U.S.C. § 2615(a)(2), which provides, "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." Such a claim is analyzed according to the proof requirements for Title VII claims. *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006). Thus, a plaintiff may establish her claim through direct or circumstantial evidence of an improper motivating factor for an adverse employment action or she may utilize the burden-shifting analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213-14 (4th Cir. 2007).

Townes has provided neither direct nor circumstantial evidence of an improper motive by the Department to retaliate against her for taking protected leave. Consequently, she may only prevail on her claim by showing (1) she engaged in protected activity, (2) her employer took adverse action against her, and (3) the adverse action was causally connected to her protected activity. *Yashenko*, 446 F.3d at 551. If Townes were to establish her *prima facie* case, then the burden would shift to the Department to proffer a legitimate reason for its adverse action. Following that proffer, the burden would shift back to Townes, who bears the ultimate burden of persuasion, to prove the Department's proffered reason is merely pretextual. *Id.*

As was noted in *Yashenko*, taking FMLA leave constitutes engagement in protected activity. *Id.* Thus, the first element is undisputed in this case in which Townes had three separate leaves of absence for health reasons. However, Townes fails to establish the second element of her *prima facie* case, *i.e.*, an adverse employment action.

"An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks omitted). Here, Townes asserts both the letter of reprimand and the unsatisfactory performance evaluation constitute adverse employment actions because they adversely affected her ability to draw leave from the Leave Bank. "A 'downgrade of a performance evaluation *could* [a]ffect a term, condition, or benefit of employment' if it has a tangible effect on the terms or conditions of employment. However, a poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *Id.* at 377 (citations omitted).

Deposition testimony established that an employee with an unsatisfactory performance evaluation or any discipline would not be eligible for the Leave Bank. (Pl.'s Opp'n, Ex. 12, Deitchman Dep. 39:7-10.) Even if she had had no negative disciplinary record, however, Townes would have been eligible to draw leave from the Leave Bank only if she had exhausted all other forms of leave, *see* Md. Code Ann., State Pers. & Pens. § 9-603(c)(1) (LexisNexis 2015) (leave from Leave Bank granted to employee who "has exhausted all forms of annual, personal, sick, and compensatory leave because of a serious and prolonged medical condition"), a fact she acknowledged in her deposition testimony (Def.'s Reply, Ex. 42, Townes Dep. 259:10-11).

Townes's argument focuses on her status in September 2012 when she says she was prevented from accessing the Leave Bank because of the letter of reprimand and the unsatisfactory evaluation. However, the Department has provided clear evidence that Townes had many hours of various kinds of unexhausted leave in the relevant time period. Specifically,

her Bi-weekly Time and Attendance Reports reveal that, as of June 26, 2012, Townes had returned to work from her second leave of absence and had 189.23 annual, 10.82 sick, 40 personal, and 80 holiday hours of leave. (*Id.* Ex. 43, DJS001112.) The Department does not have this same report for September 2012, but it has her report for the pay period from October 31, 2012, through November 13, 2012, and that report shows she had, as of November 13, 2012, 97.73 annual, 38.32 sick, 16.50 personal, 20.20 compensatory, and 56 holiday hours of leave. (*Id.* Ex. 44, DJS001099.) The Department points out that Townes earned annual leave at the rate of 6.15 hours and sick leave at the rate of 4.62 hours per two-week pay period. (*Id.*) Consequently, it was "mathematically impossible for her to have exhausted sick and annual leave in September 2012, but to then have accrued close to 100 hours of annual leave and close to 40 hours of sick leave by the end of October, 2012." (Def.'s Reply 4.)[1]

The Department's point is well taken. It is reasonable, therefore, to conclude that Townes's inability to access the Leave Bank was caused not by negative disciplinary action but by the operation of state law making her ineligible to draw leave as long as she possessed unexhausted hours of leave. As a result, Townes has failed to establish the Department took an adverse employment action against her, which renders her claim of FMLA retaliation meritless.[2]

---

[1] Townes submitted an exhibit upon which she relies as proof that she exhausted her annual and sick leave as of September 13, 2012. (Pl.'s Opp'n 6 (citing Ex. 52).) The document contains no tabulation of hours, and it does not create a genuine dispute of material fact as to how many hours of leave she had on September 13, 2012.

[2] Townes also suggests the Department's denial of reasonable accommodations constituted an act of unlawful retaliation under the FMLA. (Pl.'s Opp'n 26.) But as she acknowledges, "The question is whether there was a *change* in the terms or conditions of [plaintiff's] employment which had a 'significant detrimental effect' on [plaintiff's] opportunities for promotion or professional development.'" *James*, 368 F.3d at 375 (emphasis added), *quoted in* Pl.'s Opp'n 26. Townes effectively argues the Department's refusal to change her job duties amounts to a change in the terms or conditions of her employment, but she cites no authority in support of this circular reasoning. The Court is unpersuaded by this alternative theory of FMLA retaliation.

### B. Count III – Failure to accommodate under MFEPA

It is an unlawful employment practice in Maryland for an employer to "fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee." Md. Code Ann., State Gov't § 20-606(a)(4) (LexisNexis 2014). This statutory provision is expanded upon in state regulations, which require that a covered employer

> (1) Shall make a reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability;
> (2) Is not required to provide an accommodation, if it demonstrates that the accommodation would impose undue hardship on the operation of its business or program; and
> (3) May not deny an employment opportunity to a qualified individual with a disability, if the basis for the denial is the need to accommodate the individual's physical or mental limitations, and this accommodation, if attempted, would be reasonable.

COMAR 14.03.02.05(A). Further, the regulations indicate that an employer commits an unlawful employment practice if it fails

> to make an individualized assessment of a qualified individual with a disability's ability to perform the essential functions of a job, unless the qualification standard, employment test, or other selection criteria under which the individual was disqualified meet the requirements of a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the particular business or program.

COMAR 14.03.02.04(B)(3).

The Maryland Court of Appeals has interpreted the latter provision as requiring "action akin to an interactive process to identify a reasonable accommodation," as is required in federal law, 29 C.F.R. § 1630.2(o)(3), for compliance with the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12112(a) *et seq. See Peninsula Reg'l Med. Ctr. v. Adkins*, 137 A.3d 211, 220 (Md. 2016). Thus, the "individualized assessment" required by COMAR 14.03.02.04(B)(3) should be similar to what federal law requires: the employer is to "initiate an informal, interactive process with the individual with a disability in

6

need of the accommodation" to identify a reasonable accommodation. *Adkins*, 137 A.3d at 219 (quoting 29 C.F.R. § 1630.2(o)(3)). [3]

At issue in the *Adkins* case was the definition of a "qualified individual with a disability." In the regulation, the term is defined in relevant part as "an individual with a disability who [w]ith or without reasonable accommodation can perform the essential functions of the job in question." COMAR 14.03.02.02(b)(10). The court interpreted that phrase broadly, rejecting the argument that "the job in question" referred to the employee's current job. 137 A.3d at 220. Instead, the court concluded an employer's duty under COMAR 14.03.02.04(B)(3) to conduct an individualized assessment must focus upon the employee's ability to perform the essential functions of "'*a* job, not simply the job that the employee held.'" 137 A.3d at 224 (quoting opinion of Maryland Court of Special Appeals, 224 Md. App. 115, 145 (2015)). Moreover, Maryland law expressly includes reassignment to a vacant position as an example of a reasonable accommodation. COMAR 14.03.02.05(B)(5).

A *prima facie* case for a claim of failure to accommodate may be established if the employee shows

> (1) that he or she was an individual with a disability; (2) that the employer had notice of his or her disability; (3) that with reasonable accommodation, he or she could perform the essential functions of the position (in other words, that he or she was a "qualified individual with a disability"); and (4) that the employer failed to make such accommodations.

*Adkins*, 137 A.3d at 220. The Department does not take issue with Townes's proof on the first or second elements; instead, it focuses only on the third element and contends Townes's proof fails on that point. (Def.'s Mot. Summ. J. Supp. Mem. 17.) As for the fourth element, the

---

[3] Additionally, the Director of the Department's Office of Fair Practices acknowledged in his deposition testimony that the State of Maryland's Reasonable Accommodations Policy and Procedure, Section 5.5, indicated the employer should promptly initiate the interactive process with the employee to determine the employee's needs and identify the appropriate reasonable accommodation. (Pl.'s Opp'n, Ex. 37, Proctor Dep. 7:4-8, 8:11-15; *see also id.*, Ex. 38, "Reasonable Accommodations Policy Dond Procedure.")

Department argues no reasonable accommodation existed; hence, it did not fail to make such accommodation. (*Id.* 22.)

Townes's history of employment and her medical history are undisputed. She began employment with the Department in 1995 as a case manager. She was classified as a Case Management Specialist ("CMS") I at the beginning of her tenure, was promoted to CMS II, and was promoted again to CMS III by mid-1999; she stayed in that classification from then to her departure from the Department at the end of September 2013. (*Id.* 2.) Within that classification, Townes received varying job assignments over the years, including Probation and Aftercare, Spotlight on Schools, the Female Intervention Unit ("FIT"), and Intake. (Pl.'s Opp'n Supp. Mem. 1; Ex. 1, Pl.'s Ans. to Interrog. No. 4; Ex. 2, Townes Dep. 35:18—36:5; 66:8-11, 19-20; 111:9-17.) Townes, who lives in Baltimore City, was transferred from the Baltimore City Region to the Southern Region (based in Anne Arundel County) in 2002. (Def.'s Mot. Summ. J. Supp. Mem. 5; Townes Dep. 15:20—17:5; Def.'s Ex. 12, Personnel Transaction Transmittal.) Initially assigned to Intake, she was reassigned four or five years later to Spotlight on Schools. (Townes Dep. 87:15—88:6.) She stayed in that position until her return from her second leave of absence, when she was assigned to Probation and Aftercare. (*Id.* 108:13-15.)

Although she began receiving treatment from a psychiatrist, Donn Teubner-Rhodes, M.D., in 2008, Townes received job evaluations of satisfactory or better through 2011. (Pl.'s Ex. 3, Teubner-Rhodes Dep. 9:9-15; Pl.'s Ans. to Interrog. No. 4; Pl.'s Ex. 4, DJS Performance Evaluations.) In late 2011 and early 2012, she was diagnosed with severe iron deficiency (anemia), vitamin D deficiency, and uterine fibroids. (Def.'s Ex. 15, Let. Dwight D. Im, M.D., Jan. 19, 2012.) Her first medical leave was from early December 2011 through February 27, 2012. (Townes Dep. 149:16-21.) She took a second medical leave from May 16 to June 18,

2012, for a surgical procedure and a recovery period. (Pl.'s Ex. 5, Bi-Weekly Time and Attendance Reports, DJS001110-1112.) Dr. Teubner-Rhodes gave Townes a diagnosis of bipolar disorder in January 2012. (Pl.'s Ex. 33, Teubner-Rhodes Expert Disclosures.) Her third medical leave began at the end of March 2013. (Def.'s Ex. 18, Teubner-Rhodes Med. Slip.)

When Townes returned to work in mid-June 2012, she had been reassigned from her Spotlight on Schools position in Glen Burnie to Probation and Aftercare, working out of the Annapolis office. (Pl.'s Ans. to Interrog. No. 4; Townes Dep. 182:2-13.) A letter of reprimand was discussed with Townes on July 5, 2012, and issued to her on July 11, 2012 (Pl.'s Ex. 13), and she received an unsatisfactory performance evaluation on July 26, 2012 (Pl.'s Ex. 14). She was reprimanded in relation to one of her former student assignees, who had been withdrawn from Townes's assigned school, Old Mill High School, by her mother shortly before Townes returned to work from her first medical leave; Townes protested the reprimand, believing it unfair. (Pl.'s Ex. 6, Memo to Supervisor, July 6, 2012; Townes Dep. 134:1-7; 136:4-11.)

In the Probation and Aftercare assignment, Townes supervised youths in placement facilities across the state from Western Maryland to the Eastern Shore. (Townes Dep. 114:2-6.) But she also continued to supervise youths at Old Mill High School, where she formerly had been based; however, a new case worker occupied the office in which she had worked at Old Mill, and her belongings and files were moved to Annapolis before she returned from her second medical leave. (Townes Dep. 110:6-17; 115:3-10; 115:16—116:1.) Townes's caseload increased in the new assignment, and she was the subject of several "mitigating conferences" or counseling memoranda, which are part of the disciplinary process. (Townes Dep. 116:13-15; 185:9—186:13.) She requested meetings with various people in the management hierarchy about her work conditions, but no meeting took place. (Townes Dep. 137:14-21.)

Dr. Teubner-Rhodes saw her and had telephone conversations with her between September 2012 and April 2013; he attributed the exacerbation of Townes's bipolar disorder during that time to work-related stress rather than physical ailments. (Teubner-Rhodes Dep. 50:13-19; Teubner-Rhodes Expert Disclosures; Pl.'s Ex. 34, Let. Teubner-Rhodes, Apr. 2, 2013.) On March 27, 2013, he provided a doctor's note indicating that, as of that date, Townes was medically unable to work and that he would reevaluate her condition in two weeks. (Def.'s Ex. 18.)

On April 2, 2013, Dr. Teubner-Rhodes wrote Phillip Deitchman in the Department's Human Resources office. (Pl.'s Ex. 34.) Dr. Teubner-Rhodes noted he had been successfully treating Townes for bipolar disorder, but, because of job-related stress, he had changed Townes's diagnosis to include a diagnosis of adjustment disorder with mixed anxiety and depressed mood. (*Id.*) He noted that Townes, upon her return from her second medical leave, had been transferred to an entirely different case load, responsibilities, location, and a new supervisor; he said the content of his conversations with her had dramatically changed since the reassignment, relating mostly to work-related stresses. (*Id.*) He further noted Townes had a panic attack while at work on September 12, 2012, and required transportation by ambulance to the hospital. (*Id.*) She began having nightmares about work, which caused sleep deprivation, which, in turn, caused difficulty for her in concentrating at work; she feared she would lose her job. (*Id.*) Dr. Teubner-Rhodes concluded Townes was medically unable to work because of the combination of bipolar disorder and the adjustment disorder; the date of disability began March 22, 2013, and he did not anticipate her return until at least May 6, 2013. (*Id.*)

On April 4, 2013, Dr. Teubner-Rhodes completed a Leave Bank medical request form, indicating Townes could work in a modified capacity and stating, "She needs an office with a

less than 30 minute commute somewhere other than the current office where there is an allegation of a hostile work environment." (Pl.'s Ex. 35.) The next day, Dr. Teubner-Rhodes wrote Eyetta Brown in the Department's Human Resources office, saying, "Once the job modifications I recommended are implemented I believe Ms. Townes can return to work full duties. I believe when implemented she will be ready for full duties by May 6th, 2013." (Pl.'s Ex. 36.)

According to the Reasonable Accommodations Policy and Procedure, an employee may make a request for a reasonable accommodation to a supervisor, manager, ADA Coordinator, or Human Resources Representative, and the request can be in writing or made verbally; the request need not mention the ADA or the phrase "reasonable accommodation." Sections 5.1, 5.2 (Pl.'s Ex. 38.)

On April 30, 2013, Jacqueline Anderson in Human Resources sent an email to Douglas Mohler, who was the Southern Regional Director for the region to which Townes was assigned. (Pl.'s Ex. 39.) Anderson repeated Dr. Teubner-Rhodes's request from the April 4 Leave Bank form and asked if Townes could be accommodated; she also stated, "If Management is unable to support this modification, then Ms. Townes will have to stay out on medical leave until such time she is able to report to full duty in her currently assigned office location." (*Id.*) Mohler responded,

> I have not seen any additional documentation and I am not sure how her personal commute has anything to do with her ability to work. I also do not know what her commute has to do with her allegation of a hostile work environment, first time I heard about that. If she has medical documentation that she is ill, then she should be on medical leave until she is well enough to return to work. *I am not sure how we could accommodate her. Her duties would not change. CMS position in the Annapolis office.*

(*Id.* (emphasis added).)   Charles A. Proctor, Director of the Department's Office of Fair Practices, who apparently was copied on the above email exchange, responded, "To date, Ms. Townes has filed not [*sic*] complaint with this office.  Nor have I received a request for a Reasonable Accommodation." (*Id.*)

On May 1, 2013, Proctor received a copy of the April 4 Leave Bank form.  (Proctor Dep. 16:7-18.)  Proctor went to Human Resources and met with Daffney Dennis, who was then in charge of employer/employee relations; Proctor asked Dennis "if there were any case management positions in Baltimore, in or around Baltimore." (*Id.* 17:2-8.)  Dennis said, "No." Dennis then told Proctor that the Department had done a study indicating there were too many case managers in every region except the Metro Region (Prince George's County and Rockville) and that the Department was transferring case managers from other regions to the Metro Region. (*Id.* 17:13—18:8.)  Dennis also told him there were not going to be any openings.  (*Id.* 19:6-7.) The Department concedes, however, that "around this time, some case managers were hired to offices in Baltimore City and Baltimore County." (Def.'s Mot. Summ. J. Supp. Mem. 7.)

The Regional Director for Baltimore City Region, Dwain Johnson, testified that several positions were open in Baltimore City during the relevant time period.  An example was an Intake position that became vacant on May 31, 2013, due to the retirement of the incumbent, and was not filled until August 21, 2013.  (Pl.'s Ex. 26, Johnson Dep. 51:18—52:14, 61:21—62:1; *see also* Ex. 40, Spreadsheet.)  The incumbent worked the day shift (Pl.'s Ex. 41, R.B. Aff.), and his contacts with youths were in the intake area within the Gay Street building in Baltimore where the Juvenile Court is located (Johnson Dep.17:19-21; 18:1-3; 55:7-13).

Dr. Teubner-Rhodes made an additional request for reasonable accommodations on July 1, 2013, indicating in addition to his earlier requested accommodations that "community

casework that requires her to drive from place to place is too stressful . . . [and that] [s]he therefore, needs to work in a school or intake so that she won't be traveling from place to place"; he also indicated it is medically necessary for her to work the day shift. (Def.'s Ex. 25.) The Department requested Townes submit to an independent psychological evaluation, which was completed on August 26, 2013; the evaluating psychologist, James Moses Ballard II, Ph. D., stated,

> *It is unlikely that Ms. Townes will be able to perform all duties and responsibilities without the aforementioned accommodations* of moving from her current work assignment, working in an environment so that she will not have to drive from place to place, working on the day shift, and limiting her commute distance of less than 30 minutes. . . . It is recommended that her medication for depression be adjusted and stabilized prior to a discussion of whether or not she is able to perform all tasks assigned to her classification of DJS Case Management Specialist III with accommodations.

(Def.'s Ex. 27 (emphasis added).) Approximately one week later, Robert Toney, M.D., completed a "follow-up workability evaluation" in which he indicated Dr. Ballard had concluded "that Ms. Townes was unable to effectively perform her job duties with or without reasonable accommodations." (Def.'s Ex. 28.) The Court notes Dr. Toney's summary of what Dr. Ballard concluded is at odds with Dr. Ballard's stated conclusion. Further, without specifying what the essential duties were of any particular job within the CMS III classification, Dr. Toney concluded:

> Based on the above information, it is my impression that Ms. Townes is unable to safely, consistently, and reliably perform the essential duties of her position with or without reasonable accommodations. It is therefore my recommendation that the agency take the appropriate administrative actions in terms of her employment status as a DJS Case Management Specialist III.

(*Id.*)

In connection with the instant case, Dr. Teubner-Rhodes reviewed the list of job vacancies in 2013 when he had requested reasonable accommodations for Townes, and he

opined she could have filled several of these positions, including the one in Intake in Baltimore City.  (Pl.'s Ex. 51, Teubner-Rhodes Letter June 27, 2016.)  He believed these positions met the restriction on driving distance and also noted they were positions she successfully performed in the past.  (*Id.*)  Other than receiving a Task Analysis form to complete and return to the Department, Dr. Teubner-Rhodes was never contacted by anyone at the Department to ascertain what he meant by the particular accommodations he requested for Townes.  (Teubner-Rhodes Dep. 176:4-10.)  With no other option available to her, Townes took disability retirement effective October 1, 2013.

From this evidence, the Court concludes a genuine dispute of material fact exists as to whether the Department engaged in the necessary, *interactive* process to conduct an individualized assessment of Townes's ability to perform the duties required of *a* job, not necessarily the job she held in Probation and Aftercare in Annapolis, which necessitated her cross-state travel and which seems to have been the only job considered by the Department in response to her request for reasonable accommodation.  Further, a dispute exists as to whether Townes could have been reasonably accommodated by transfer to another position.  For those reasons, summary judgment cannot be granted to the Department on Count III.

## IV. *Conclusion*

A separate order will enter granting summary judgment to the Department on Count II and denying the same on Count III.

DATED this 8th day of February, 2017.

                                            BY THE COURT:

                                            _____/s/_____
                                            James K. Bredar
                                            United States District Judge